JASON E. RIOS, State Bar No. 190086
FELDERSTEIN FITZGERALD WILLOUGHBY
PASCUZZI & RIOS LLP
500 Capitol Mall, Suite 2250
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
jrios@ffwplaw.com

Attorney for Harbin Terrace, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DIVISION OF CALIFORNIA

LOS ANGELES DIVISION

|  |  |
|---|---|
| In Re:<br><br>IDAHO ALLERGY, LLC,<br><br>Debtor. | Case No. 2:23-bk-12146-VZ<br><br>Chapter 11<br>(Subchapter V)<br><br>**HARBIN TERRACE, LLC'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM AND TO COMPEL PAYMENT OF ADMINISTRATIVE RENT AND TO COMPEL ASSUMPTION OR REJECTION OF LEASE; DECLARATION OF CRAIG HARBIN IN SUPPORT THEREOF**<br><br>Date: August 22, 2023<br>Time: 11:00 a.m.<br>Courtroom: 1368<br>  255 East Temple Street,<br>  Los Angeles, CA 90012<br>Judge: Honorable Vincent P. Zurzolo |

Harbin Terrace, LLC (the "Landlord") files this Motion for Allowance of Administrative Claim and to Compel Payment of Administrative Rent and to Compel Assumption or Rejection of Lease ("Motion"). For the reasons detailed below, the Landlord respectfully requests this Court enter an order: (1) compelling the Debtor's immediate payment of post-petition administrative rent;

HARBIN TERRACE, LLC'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM AND TO COMPEL PAYMENT OF ADMINISTRATIVE RENT AND TO COMPEL ASSUMPTION OR REJECTION OF LEASE                                                - 1

and (2) compelling the Debtor's immediate rejection of the Lease.  Landlord is also filing a motion for relief from the automatic stay, concurrently herewith.

## I.    INTRODUCTION

In the two months since the filing of the debtor-in-possession, Idaho Allergy LLC's ("Debtor") bankruptcy case, and despite Debtor's stated intention to assume and promptly cure the Lease (defined below) arrears and comply with the terms of the Lease going forward, the Debtor has failed to make its lease payment for July 2023 for the post-petition administrative rent owed to Landlord[1]. Additionally, the August 2023 Lease payment is quickly approaching, putting the Debtor that much farther behind.  What this means is the Debtor has been attempting to conduct the Debtor's business operations without timely paying rent – a course of action that is not only inequitable, but contrary to the clear mandate of the Bankruptcy Code.   When the Debtor's failure to pay administrative rent is coupled with the fact that the Lease has not been assumed or rejected, it cannot be reasonably disputed that the Landlord is not adequately protected from the likely event that this Debtor will ultimately be administratively insolvent. Without an immediate assumption or rejection of the Lease, the Landlord is likely to be significantly harmed should the Debtor continue to conduct business operations without paying rent, only to have the estate become administratively insolvent or convert to Chapter 7. The Landlord is not required to bear this burden – as conclusively established by the plain language of the Bankruptcy Code.

This Motion is supported by the Declaration of Craig Harbin (the "Harbin Decl.") filed herewith.

---

[1] On July 11, 2023, Debtor made payment to Landlord in the amount of $6,645.00 as payment for its July 2023 rent.  This payment did not include the post-petition late charges owed by Debtor to Landlord.  On July 17, 2023, the payment was stopped at the request of the Debtor and returned. Therefore, the July 2023 lease payment to Landlord remains outstanding.

**HARBIN TERRACE, LLC'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM AND TO COMPEL PAYMENT OF ADMINISTRATIVE RENT AND TO COMPEL ASSUMPTION OR REJECTION OF LEASE**                    - 2

## II.    BACKGROUND AND RELIEF REQUESTED

The debtor in possession allegedly operates a medical practice focusing on allergy services. Its practice occupies certain real property located at 379 E. Shore Drive, Suite 100 (and until recently an adjacent storage space in Suite 120), Eagle, Idaho 83616 ("Leased Property"). On or about January 1, 2021, Landlord and Debtor entered into a Commercial Lease Agreement for the Leased Property and an Additional Space Contract Addendum (collectively the "Lease").  A true and complete copy of the Lease is attached to the Harbin Decl. as **Exhibit A** and incorporated herein by reference.  No party has any interest in the Lease other than Debtor and Landlord.

Since the filing of its bankruptcy on April 10, 2023, the Debtor has neither assumed nor rejected the Lease.  The Debtor has lacked the financial capability to make its lease payments for some time.  Prior to its bankruptcy filing, the Debtor failed to make its lease payments to Landlord for January, February, March, and April 2023, leaving $45,045.71 due Landlord as of the petition date.  *See* Claim No. 6, filed on June 20, 2023.  Thereafter, Debtor has paid post-petition lease payments for May and June 2023.  These payments were made late and only in the amount of base rent; the Debtor did not pay the late charges for these lease payments.  The Debtor remains obligated to continue to make post-petition rent payments pursuant to Bankruptcy Code Section 365(d)(3).  As of July 17, 2023, the total unpaid post-petition lease payments is $7,347.90.  The total amount of pre-petition and post-petition amounts due under the Lease to Landlord as of July 17, 2023, is $52,393.61.

In its bankruptcy schedule G, the Debtor stated its intention as to the Lease, saying, "Debtor is 3 months pre-petition delinquent but intends to assume the lease and promptly cure the pre-petition arrears." (Dkt. 40, Schedule G, at 2.1).  This intent is reiterated in the Debtor's Subchapter V Status Report, filed on May 4, 2023, when the Debtor makes the same statement regarding the Lease as

was contained in its Schedule G. Notwithstanding these statements, the Debtor has not paid in full the Lease charges for its May and June 2023 payments and has not paid the Landlord for July 2023. In addition, Debtor has provided Landlord no assurances of Debtor's ability of continuing performance of the terms of the Lease. This is compounded by the lack of legal counsel for the Debtor since entry of the June 27, 2023, Order Granting Motion to Withdraw (Dkt. 97). Debtor is also delinquent in its obligation to file monthly operating reports, with its last report (for the month ending May 3, 2023) having been filed on June 22, 2023. *See* Dkt. 91. Now, the *pro se* Debtor is facing a Motion to Dismiss or Convert, filed by the United States Trustee on June 29, 2023. *See* Dkt. 99. The Debtor has not responded to this motion, with the hearing thereon looming on July 27, 2023. The Debtor has failed to file its Subchapter V Chapter 11 Plan within the deadline established by the Court. Dkt. 54. To date, the Debtor has refused to turn over the Leased Property but has continued its business operations at the Leased Property to the detriment of Landlord. Though the Debtor has indicated its intent to assume the Lease, there's no indication that the Debtor has the financial wherewithal to cure the pre-petition and post-petition defaults or the ability to provide assurance of a prompt cure or to compensate the Landlord for the pecuniary loss caused by Debtor's defaults, as required by 11 U.S.C. Section 365(b). Debtor's April 2023 monthly operating report demonstrates the Debtor's precarious financial situation, with thin margins at best, and Debtor projects a negative cash flow for May 2023. (Dkt. 67, at ¶ 37, showing a total projected net cash flow for next month of -$2,567.00). Debtor's May 2023 monthly operating report continues to highlight the Debtor's difficult financial situation and its thin margins. (Dkt. 91, at ¶ 37, showing a total projected net cash flow for next month of $2,433.00). Indeed, Debtor spent more in May than it took in. (*Id.*, at ¶¶ 32-34 showing cash receipts of $62,371.56, cash disbursements of $86,089.92 for a net cash flow of -$23,718.36).

**HARBIN TERRACE, LLC'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM AND TO COMPEL PAYMENT OF ADMINISTRATIVE RENT AND TO COMPEL ASSUMPTION OR REJECTION OF LEASE** - 4

Based on the facts above, the Landlord moves pursuant to Bankruptcy Code Section 365 for an order compelling Debtor to reject the Lease for the reasons set forth above.  Landlord does not consent to any extension of the time for Debtor to assume or reject the Lease.  Because the Debtor has only made one of the required post-petition payments and significant pre-petition amounts are also due, sufficient cause exists to compel rejection of the Lease, and the Landlord requests the same.  Additionally, the Landlord moves the Court for an order compelling the immediate payment of all post-petition unpaid lease payments, pursuant to the clear and plain language of the Bankruptcy Code.

The Landlord has separately filed a motion for relief from the automatic stay, seeking leave of the Court for Landlord to exercise all of its remedies under the Lease, including without limitation, to terminate the Lease and to recover possession of the Leased Premises from the Debtor.

### III.    ARGUMENT

**A.    Landlord's request for allowance of an administrative claim and immediate payment of administrative rent is proper and justified.**

Section 503(b)(1)(A) allows post-petition administrative expenses for "the actual, necessary costs and expenses of preserving the estate."  *See, e.g., In re Southern Mont. Elec. Generation & Transmission Coop., Inc.*, 59 Bankr. Ct. Dec. 168, 2014 WL 2615710 (Bankr. D. Mont. June 11, 2014) citing *Einstein/Noah Bagel Corp. v. Smith (In re BCE West, L.P.)*, 319 F.3d 1166, 1172 (9th Cir. 2003).  "To establish such a claim, the claimant must show that the debt: (1) arose from a transaction with the debtor in possession; and (2) directly and substantially benefitted the estate."  *Id*.  "The bankruptcy court has broad discretion to determine whether to grant a § 503 claim." *Id.*; *referencing In re Santa Monica Beach Hotel, Ltd*., 209 B.R. 722, 725 (9th Cir. BAP 1997), citing *In re DAK Indus., Inc*., 66 F.3d 1091, 1094 (9th Cir. 1995).

"The Ninth Circuit has held that any obligation of a debtor-in-possession under a non-residential lease of real property, pending assumption or rejection of the lease, whether or not related to debtor's use of the property, enjoys the administrative expense status and right to prompt performance conferred by 11 U.S.C. § 365(d)(3)." *In re Art & Architecture Books of the 21st Century*, 522 B.R. 249, 259-260 (Bankr. C.D. Cal. 2014) referencing *In re Cukierman*, 265 F.3d at 850. "Section 365(d)(3) requires the payment of rent in the amount required by the lease (not some other "fair value" amount based on the estate's actual use and occupancy of the premises), plus all other obligations of the tenant debtor under the lease (e.g., common area maintenance charges)." *Id.* (parentheticals in original).

11 U.S.C. Section 365(d)(3) provides in relevant part:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

11 U.S.C. §365(d)(3).

"Thus, a trustee or debtor-in-possession's statutory obligation as tenant to timely perform its obligations under an unexpired nonresidential lease extends to all obligations under the lease regardless of whether those obligations are related to the debtor's use of the premises." *In re Art & Architecture Books of the 21st Century*, 522 B.R. at 259-260 referencing *In re Cukierman*, 265 F.3d at 850. "[A]s recognized in Ninth Circuit precedent of Cukierman requires the 'immediate payment' of lease obligations pending assumption or rejection of a lease. As such, any argument by Debtor and the

Committee that the payments due pursuant to 11 U.S.C. § 365(d)(3) need not be made immediately are unavailing." *Id*.; *see also In re Shoot the Moon, LLC*, 2016 WL 1452671 (Bankr. D. Montana 2016) (requiring immediate payment of post-petition lease obligations).

It cannot be reasonably disputed that the Lease is an unexpired lease for non-residential real property.  As the Debtor has neither assumed or rejected the Lease, and as the Debtor has not made its July 2023 post-petition rent payment to the Landlord (with the August payment on the horizon), Landlord respectfully requests this Court grant this Motion and order the Debtor to immediately pay all post-petition rent currently due and owing.  Further, the Landlord requests that the Court order the Debtor to timely tender all future amounts due and owing under the Lease until such time as the lease is rejected.

**B.    The Debtor should be compelled to reject the Lease.**

Section 365(d)(2) of the Bankruptcy Code provides the Court with the power to compel a debtor to assume or reject an executory contract within a specified period of time:

> In a case under chapter . . . 11 . . . of this title, the trustee may assume or reject an executory contract...of the debtor at any time before the confirmation of a plan *but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract* . . .

11 U.S.C. §365(d)(2) (emphasis added); 11 U.S.C. §1107(a).

"Congress intended this provision to 'prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate.'" *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992) (*citing* S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).

"Although the Bankruptcy Code provides chapter 11 debtors with a breathing space within which to determine whether a particular executory contract should be assumed or rejected, such

breathing space . . . is not without limits." *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002) (internal quotations omitted). The determination of what constitutes a reasonable time to assume or reject a particular executory contract is within the bankruptcy court's discretion and has to be decided in light of the particular facts of each case. *See, e.g., S. St. Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 760 (2d Cir. 1996); *Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 105 (2d Cir. 1982); *Dallas-Fort Worth, supra.; In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003); *In re Hernandez*, 287 B.R. 795 (Bankr. D. Ariz. 2002).

Among the factors that the courts have used to determine what may constitute "reasonable time" for the purposes of Section 365(d)(2) of the Bankruptcy Code are the following: (a) the nature of the interests at stake, (b) the balance of harm to the parties, (c) the safeguards afforded to the parties, (d) the damage third parties may suffer beyond the compensation available under the Bankruptcy Code, (e) the debtor's failure or ability to satisfy post-petition obligations, (f) the purposes of chapter 11, (g) the importance of the contract in question to the debtor's reorganization, and (h) whether the action to be taken is so in derogation of Congress' scheme as to be said to be arbitrary. *See all cases collected in In re: Adelphia Communications Corp.*, 291 B.R. 283, 292-94 (Bankr. S.D.N.Y. 2003).

The Court must make an equitable determination, based on the balance of harm, in light of the particular circumstances of the parties to the Lease. In applying the *Adelphia* factors, the Landlord respectfully submits that the circumstances in this case should persuade the Court to compel the rejection of the Lease. First, the Debtor has an obligation under the Lease and Section 365(d)(3) to timely perform all obligations under the Lease arising after the petition date (April 10, 2023) until the Lease is rejected. This includes the Debtor's obligation under the Lease to pay rent.

1    Next, requiring the Debtor to reject the Lease at this time does not impose any type of hardship

2    on the Debtor. As set forth above, based on the Debtor's financial inability to cure the defaults under

3    the Lease, requiring rejection of the Lease limits the Debtor's ongoing accrual of a large administrative

4    claim. Similarly, forcing the Landlord to remain bound to the Lease without ongoing lease payments

5    or an ability to cure the default—a prerequisite to assuming the Lease— will not benefit the estate in

6    any way. To the contrary, allowing the Debtor to remain in possession without the ability to pay post-

7    petition rent will create significant administrative claims that will encumber the Debtor's estate, not to

8    mention the significant financial burden this imposes on the Landlord. Consequently, the Landlord

9    submits that the facts and circumstances in this case warrant entry of an order compelling the Debtor

10   to reject the Lease and allow the Landlord to take appropriate steps to limit its damages. In the face of

11   the bleak financial outlook of the Debtor (*see, e.g*., Dkts. 67 and 91), without an immediate rejection

12   of the Lease, the Landlord is likely to be significantly harmed.

13       WHEREFORE, for the reasons set forth herein, Landlord prays that the Court enter an order

14   (i) compelling the immediate payment of all administrative rent due and owing to Landlord; and (ii)

15   compelling immediate rejection of the Lease.

16

17

18

19   Dated:  July 28, 2023                FELDERSTEIN FITZGERALD
                                          WILLOUGHBY PASCUZZI & RIOS LLP
20

21                                        By:
22                                        JASON E. RIOS
                                          Attorneys for Harbin Terrace, LLC
23

24

25

26

27

28   **HARBIN TERRACE, LLC'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM AND TO
     COMPEL PAYMENT OF ADMINISTRATIVE RENT AND TO COMPEL ASSUMPTION OR REJECTION
     OF LEASE**                              - 9

**DECLARATION OF CRAIG HARBIN IN SUPPORT OF HARBIN TERRACE, LLC'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM AND TO COMPEL PAYMENT OF ADMINISTRATIVE RENT AND TO COMPEL ASSUMPTION OR REJECTION OF LEASE**

I, Craig Harbin, declare as follows:

1.     I am a Member of Harbin Terrace, LLC ("Landlord"), a creditor and party in interest in the above entitled case.

2.     I make this Declaration in support of Harbin Terrace, LLC's Motion for Allowance of Administrative Claim and to Compel Payment of Administrative Rent and to Compel Assumption or Rejection of Lease ("Motion").  The documents submitted herewith, referenced herein or otherwise relied upon by me for purposes of this Declaration are the business records of Landlord, which are currently prepared and kept in ordinary and regularly conducted business activities of Landlord, and used by me for those purposes.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.     Idaho Allergy LLC's ("Debtor") has failed to make its July 2023 payment for the post-petition administrative rent owed to Landlord.[1]    Additionally, the August 2023 Lease payment is quickly approaching, likely putting the Debtor that much farther behind.

4.     The Debtor allegedly operates a medical practice focusing on allergy services.  Its practice occupies certain real property located at 379 E. Shore Drive, Suite 100 (and until recently an adjacent storage space in Suite 120), Eagle, Idaho 83616 ("Leased Property"). On or about January 1, 2021, Landlord and Debtor entered into a Commercial Lease Agreement for the Leased Property and an Additional Space Contract Addendum (collectively the "Lease").  A true and complete copy of the Lease is attached hereto as **Exhibit A** and incorporated herein by reference.  No party has any interest in the Lease other than Debtor and Landlord.

5.     Prior to its bankruptcy filing, the Debtor failed to make its lease payments to Landlord for January, February, March, and April 2023, leaving $45,045.71 due Landlord as of the

---

[1] On July 11, 2023, Debtor made payment to Landlord in the amount of $6,645.00 as payment for its July 2023 rent.  This payment did not include the post-petition late charges owed by Debtor to Landlord.  On July 17, 2023, the payment was stopped at the request of the Debtor and returned. Therefore, the July 2023 lease payment to Landlord remains outstanding.

DECLARATION IN SUPPORT
OF MOTION TO COMPEL
REJECTION OF LEASE

petition date.

6.      Thereafter, Debtor has paid post-petition lease payments for May and June 2023. These payments were made late and only in the amount of base rent; the Debtor did not pay the late charges for these lease payments.

7.      As of July 17, 2023, the total unpaid post-petition lease payments is $7,347.90. The total amount of pre-petition and post-petition amounts due under the Lease to Landlord as of July 17, 2023, is $52,393.61.   In addition, Debtor has provided Landlord no assurances of Debtor's ability of continuing performance of the terms of the Lease.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on July 27, 2023 at *Meridian, Idaho*.


_____
CRAIG HARBIN

Exhibit A

Exhibit A

# BEECH TREE
PROPERTY MANAGEMENT

## COMMERCIAL LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is entered into as of this 1st day of January, 2021, collectively between the Harbin Terrace, LLC, Owner of 379 East Shore Drive, Eagle ID 83616, represented by Cory Tanner, Agent of Beech Tree Property Management (collectively referred to as "Landlord") and Idaho Allergy LLC, an Idaho company, and Dr. Sanjeev Jain, Owner (collectively referred to as "Tenant"). The parties agree that this lease is an integrated agreement and supersedes any and all past contract between the parties regarding this property.

### WITNESSETH:

In consideration of the rents, covenants, and agreements set forth in this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the premises described below on the following terms and conditions:

### ARTICLE 1

**FUNDAMENTAL LEASE PROVISIONS**

DATE:                             January 1, 2021

LANDLORD:                         Beech Tree Property Management, LLC

TENANT:                           Dr. Sanjeev Jain

TENANT'S TRADE NAME:              Idaho Allergy LLC

PERMITTED USE:                    For the operation of an allergy clinic

DIMENSIONS OF PREMISES:           See Site Plan – Exhibit "A"

SQ FT OF PREMISES:                Approximately 3126 sq. ft. plus 96 sq. ft. storage room in suite 120, TOTAL = 3,222

TERM:                             Term of this lease to extend for Five Years (60 months) beginning on the start date of this lease. Tenant shall have the option to renew said lease upon conclusion of existing lease agreement and in accordance with Article 4.

BASE RENT:

| Year | Annual Base Rent | Monthly Base Rent | Tax/HOA/SWT |
|------|------------------|-------------------|-------------|
| 1 | $77,328 | $6,445 | Included |
| 2 | $77,328 | $6,445 | Included |
| 3 | $79,740 | $6,645 | Included |
| 4 | $82,140 | $6,845 | Included |
| 5 | $84,540 | $7,045 | Included |

RENT PAYMENT:                     Beginning January 1, 2021

PRORATED RENT:                    NA

MOVE-IN CREDIT:                   NA

TERMINATION:                      Lease will terminate December 31, 2025 (Five-Year Agreement)

ADDRESS FOR NOTICES:              TO TENANT:                          TO LANDLORD:
                                  Dr. Sanjeev Jain, c/o Idaho Allergy, LLC    Beech Tree Property Management
                                  379 E. Shore Drive, Ste. 100        1577 North Linder Road, #325
                                  Eagle, ID 83616                     Kuna, Idaho, 83634

PREMISES ADDRESS:                 379 East Shore Drive, Suite 100, Eagle, ID 83616

SECURITY DEPOSIT:                 Transferred as per previous lease

GUARANTOR:                        Dr. Sanjeev Jain

**NON-RESPONSIBILITY OF PARTIES:**    Each party hereto fully understands that no party shall have any legal obligations to the other, unless and until all of the terms and conditions of the proposed transactions have been

-13-

in a definitive agreement, which has been fully executed by all parties.

## ARTICLE 2

**EXHIBITS**

The following drawings and special provisions are attached as exhibits and are made a part of this lease:
> Exhibit "A" - Site Plan and Legal Description
> Exhibit "B" - Description of Work
> Exhibit "C" - Rules and Regulations

## ARTICLE 3

**PREMISES**

In consideration of the rents, covenants and agreements contained in this Lease, Landlord leases to Tenant and Tenant leases from Landlord certain space (the "Premises") comprising a building or a portion of a building (the "Building") in the Eagle River Business Center, located in the City of Eagle, County of Ada, State of Idaho, the location, dimensions and approximate area of which are delineated in red on Exhibit "A", which is a site plan and legal description of the Business Building. The parties acknowledge that the dimensions and area of the Premises as set forth herein are approximate and agree that Landlord shall have the right and option to cause the square footage of the Premises to be measured and verified (the "Certified Area").

## ARTICLE 4

**TERM**

**4.1    Commencement Date; Term, Renewal.** The Term and such rental obligation shall commence on the first to occur of the following date: January 1, 2021. The Term shall be for five years (60 months) and will automatically renew on an annual basis beginning on the anniversary date. In order to terminate the lease agreement at the end of the stated term, either party must furnish a 60-day written notice prior to lease term expiration. In the absence of this notice, the lease agreement will automatically renew for up to 10, one-year periods. At these renewal periods, Manager may elect to make an adjustment to current terms with a 30-day notice to tenant. Absence of a proper notice will negate management's ability to make an adjustment.

## ARTICLE 5

**BASE RENT**

**5.1    Base Rent.** Tenant agrees to pay to Landlord at such place as Landlord may designate, without prior demand and without any deduction or setoff whatsoever, and as base rent, the Base Rent specified in Article 1, to be paid in consecutive monthly installments in advance on the first day of each calendar month during the Term. Simultaneously with the execution of this Lease, Tenant has paid to Landlord the first month's Base Rent, receipt of which is acknowledged, subject to collection, however, if made by check. If the Commencement Date occurs on a day other than the first day of the month, then rent shall be paid on the Commencement Date for the initial fractional month prorated on a per diem basis.

## ARTICLE 6

**PERCENTAGE RENT**

Tenant is not obligated to pay percentage rent.

## ARTICLE 7

**ADDITIONAL RENT**

Tenant is not obligated to pay additional rents.

## ARTICLE 8

**SECURITY DEPOSIT**

8.1    **Deposit.** The tenant(s) shall deposit with Landlord as a Security/Pet/Other Deposit, the sum as indicated in the previous lease agreement payable prior to occupancy by means of secured funds. Of the deposit, the sum of two hundred and fifty dollars ($250) is considered non-refundable and is specifically deducted for professional services rendered by Beech Tree Property Management, LLC. Tenant cannot use the security deposit during the occupancy, or term of the Rental Agreement for rent or other expenses. The Landlord shall furnish, no later than 30 (thirty) days after the Tenant has vacated the Premises, an itemized statement for the security deposit refund. Landlord may use/deduct security deposit funds for the damage, cleaning, legal expenses, costs of collection, loss of personal property of Landlord included in this Rental Agreement, loss of rents, late fees, service fees, non-sufficient fund fees, tenant caused billing, photographs of damage, pest control, change of locks if keys issued are not returned or if Tenant provides an unauthorized person with any key to the property, termination fees, and re-rent fees. Tenant understands that the security deposit will only be refunded when the property is completely vacated and all of Tenant's personal property has been removed. Any refund from the security deposit will be sent to the forwarding address furnished by the tenant. If Tenant does not provide an accurate forwarding address, Landlord shall not be responsible for the delayed delivery. Tenant shall also be required to pay a fee of $40 if a stop payment is necessary. Should Owner change management companies or sell the property, Tenant authorizes Landlord to assign this Agreement to the new owner or Management Company and release any deposits or other Tenant related funds to the new Owner or Management Company, less any fees owed to Landlord as described within this Agreement and hold Landlord harmless from that assignment date and forward. If Tenant has made a security deposit with a prior owner or property manager other than Landlord and the deposit has not been transferred to the current owner or Landlord, the Tenant understands that any refund of the deposit must be pursued directly from the prior owner or property manager and that Landlord shall have no responsibility for the same. *(Idaho Code, Section 6-321)*

Disputes about Security Deposit refunds must be made in writing, using the Deposit Refund Appeal Form, within thirty days (30) from the date of the refund or deposit refund notice. This form may be requested of the Landlord. Tenant shall relinquish all rights to further action beyond this 30-day period if written notice has not been submitted to Landlord.

8.2    **Default.** On default by Tenant with respect to any of its obligations under this Lease, including but not limited to the payment of Base Rent, Percentage Rent or Additional Rent, Landlord may (but shall not be required to) use, apply, or retain all or any part of the security deposit for the payment of any unpaid Base Rent, Percentage Rent or Additional Rent, or for any other amount which Landlord may be required to expend by reason of the default of Tenant, including any damages or deficiency in the reletting of the Premises, regardless of whether the accrual of such damages or deficiency occurs before or after an eviction or a summary re-entry or other re-entry by Landlord. If all or any portion of the security deposit is so used or applied, Tenant shall, on five (5) days written demand, deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount. Tenant's failure to do so shall constitute a default under this Lease.

8.3    **Sale of Building.** On any sale of the Building, Landlord shall have the right to transfer the security deposit to the assignee and Landlord shall, on such transfer, be released from all liability for the return of such deposit. Tenant shall not assign or encumber the money deposited as security, and neither Landlord nor its successors or assigns shall be bound by any such assignment or encumbrance.

8.4    Sale of Business. In the event that current owner of the business as listed above desires to sell their interest in said business, this action shall and must be approved by Management at least 60-day in advance of any formal sale action taking place. Whereas the current business is being personally guaranteed by the owner listed, a new owner would likewise have to be deemed sufficiently qualified to act as guarantor of this lease agreement. Such release of liability of the selling owner and the assuming of liability and guarantorship by the new owner will have to be executed and agreed upon in writing and in advance of such action. Failure to obtain agreement in writing shall nullify the transfer of personal liability.

## ARTICLE 9

### CONSTRUCTION

9.1    **Improvements.** Tenant, at its own cost and expense, shall construct and install its fixtures and equipment and shall perform all other work set forth on Exhibit "B", incorporating in such construction all applicable items of work described on Exhibit "B". Tenant shall have the right to enter the Premises and to obtain keys thereto to perform Tenant's work prior to the Commencement Date but after Landlord has given notice.

9.2    **Changes to building.** Landlord reserves the right at any time to make changes, alterations or additions to the Business Center, including the building and leasing of additional commercial space in or on the Building, anywhere on the Site Plan attached as Exhibit "A", or elsewhere in the Business Center. Tenant shall not, in such event, claim or be allowed any damages or have the right to terminate this Lease for injury or inconvenience occasioned as a result of such changes.

## ARTICLE 10

### USE OF PREMISES

10.1    **Use.** Tenant shall use the Premises solely for the purpose of conducting its business, which is expressly limited to the Permitted Use, **as** set forth in Article I. Such business shall be operated under Tenant's Trade Name, **as** set forth in Article I. Tenant shall not use or permit the Premises to be used for any other purpose or purposes except with the prior written consent of Landlord.

## ARTICLE 11

### CONTINUOUS OPERATION

If Tenant keeps the Premises open for business during evenings or nights other than or beyond the normal operating hours for the Business, as established by Landlord from time to time, then the costs and expenses incurred shall not affect the percentage by which utilities will be charged.

## ARTICLE 12

### LAWS; WASTE; NUISANCE

At all times during the Term, Tenant shall, at Tenant's sole cost and expense, comply with all statutes, ordinances, laws, orders, rules, regulations and requirements of all applicable federal, state, county, municipal and other agencies or authorities, now in effect or which may hereafter become effective.

## ARTICLE 13

### COMPETITION

No restrictions in the area of competition are noted.

## ARTICLE 14

### SIGNS; AWNINGS; CANOPIES

Tenant shall not place or suffer to be placed or maintained on any exterior door, wall, window or other portion of the Premises, or elsewhere on the Business Building, any sign, awning or canopy or advertising matter or other thing of any kind and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Premises without first obtaining Landlord's written approval.

## ARTICLE 15

### MAINTENANCE

15.1    **Maintenance by Tenant.** Tenant, at its sole cost and expense, shall at all times keep the Premises properly cleaned and maintained, including the repair and/or replacement when necessary of tenant caused damages to exterior entrances, all glass and show window moldings, partitions, doors, fixtures, equipment, appurtenances, lighting, heating, plumbing fixtures and sewage facilities within the Premises, electric motors and air conditioning systems and equipment, and including reasonably periodic painting as determined by Landlord. To preserve continuity in the maintenance of the heating and air conditioning system, Landlord, at its option, may elect to contract the maintenance with a third party who specializes in this field and shall have access to work on such fixtures. Landlord will be responsible for this payment as long as it is not deemed to be tenant-caused.

15.2    **Maintenance by Landlord.** Landlord shall maintain the common area bathrooms in this building on a regular basis. Landlord shall also maintain the structural components of the Business Building. For these purposes, "structural components of the Business Center" shall be defined as exterior structural walls, structural concrete slab and structural support components of the roof; provided, if Landlord is required to make structural repairs by reason of Tenant's negligent acts or omissions, Tenant shall pay Landlord's costs for making such repairs plus twenty percent (20%) for overhead immediately on presentation of an invoice. The failure of Tenant to pay such amount immediately shall constitute a default by Tenant under this Lease.

15.3    **Landlord's Right to Cure.** If Tenant refuses or neglects to repair any property as required under this Lease to the reasonable satisfaction of Landlord as soon as reasonably possible after written demand, Landlord may make such repairs without liability on its part to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures or other property or to Tenant's business by reason of such repairs, and on completion of such repairs Tenant shall pay Landlord's costs for making such repairs plus twenty percent (20%) for overhead immediately on presentation of an invoice. The failure of Tenant to pay such amount immediately shall constitute a default by Tenant under this Lease.

## ARTICLE 16

### ALTERATIONS

16.1    **Alterations.** Except as set forth in Exhibit "B", Tenant shall not make or cause to be made any alterations, additions or improvements or install or cause to be installed any trade fixtures, exterior signs, floor coverings, interior or exterior lighting, plumbing fixtures or shades or awnings, or make any changes to the store front, without first obtaining Landlord's written approval.

16.2    **Tenant's Remodel.** No particular remodel is required, and the Landlord reserves the right to require remodel at a future date but must be agreed upon by both parties to this contract in writing in order to be enforceable.

16.3    **Removal.** On the expiration or early termination of the Term, Tenant shall on written demand by Landlord (given at least sixty (60) days before the end of the Term), at Tenant's sole expense, remove any such alterations, additions, or improvements designated by Landlord. Tenant shall, forthwith and with all due diligence, at its sole expense, repair any damage to the Premises caused by such removal.

## ARTICLE 17

### MECHANIC'S LIEN

Should any mechanic's or other lien be filed against all or any portion of the Premises by reason of Tenant's acts or omissions or because of a claim against Tenant, Tenant shall cause the same to be canceled and discharged of record by appropriate bond or otherwise within ten (10) days after notice by Landlord or any other person to Tenant of such lien.

## ARTICLE 18

### UTILITIES

The Tenant shall pay for the following utilities: None - All utilities including Power, Gas, Water, Sewer, Trash and all other HOA dues shall be paid and born by the Owner. All other utilities or services such as internet services, other than as specifically indicated, are to be paid in full by the Tenant. If it is agreed in the future that Tenant shall pay directly for certain utilities, then the following shall apply: Tenant agrees to place these utilities in Tenant's name within 24 hours of occupancy of Premises, and shall provide appropriate proof of change to Landlord. Should tenant fail to place utilities in their name, Tenant agrees to pay twenty-five dollars ($25)/week/utility until the utility is switched into Tenant's name. Tenant agrees to continue to pay utilities from Lease Commencement until the termination date, as evidenced by the proper thirty (30) days written notice.

Should Landlord receive a notice at any time that utilities are either delinquent or will be shut off, a forty-dollar ($40) fee shall be assessed per utility bill. If Landlord contacts utility company and finds there is an outstanding balance owing, the Landlord may elect to pay such balance on behalf of the tenant. Tenant will then be required to promptly pay the full cost of the utility bill that was paid by Landlord. Failure to keep utility services in Tenant's name through the entire lease term, or if utilities are shown to be delinquent for greater than three months during the lease term, will result in a minimum penalty of two hundred dollars ($200) in addition to outstanding utility balances which shall be paid by Tenant. Tenant has an obligation to notify Landlord prior to any interruption of utility service to the Premises. Any damage or loss incurred due to Tenant's negligence to pay utility, abandonment, or failure to provide heat when exterior temperatures fall near freezing, or to inform Landlord of shut off shall be at Tenant's expense. Tenant further agrees to work directly with the appropriate utility company and to hold the Landlord harmless for charges incurred by Tenant. Landlord may from time to time require Tenant to pay for utility(s) directly to Landlord in addition to the rent payment. In the event the Landlord furnishes utilities, Tenant agrees to exercise diligence in conserving said utilities, specifically water, heat and electricity. If for any reason utilities are not allowed to be placed in Tenant's name, the tenant will be required to pay the balance of the utility charge plus a forty dollar ($40) per month per utility processing fee for not having utility service as indicated above. Except under instruction from Landlord or Power Company, tenant is not permitted to remove fuses or flip breakers into the "OFF" position.

## ARTICLE 19

### ASSIGNMENT

19.1    **Sublet Approved.** Tenant shall not be able to transfer, assign, mortgage, or hypothecate this Lease, in whole or in part, or permit the use of all or any portion of the Premises by any person other than Tenant, or sublet all or any portion of the Premises (each of the foregoing being referred to as a "Transfer"), without the prior written consent of Landlord.

19.2    **Conditions of Consent. Tenant must ensure that sublet tenants are sound tenants and do not adversely affect the operation of other businesses or the building.** If Tenant receives consent to a Transfer under the preceding Section, it shall be subject to the conditions of the current lease agreement.

19.3    **Landlord's Option.** If Tenant requests Landlord's consent to a Transfer, Landlord shall have the right by written notice to Tenant to terminate this Lease as of a date specified in such notice, which date shall not be less than thirty (30) days nor more than sixty (60) days after the date such notice is given.

19.4    **Consent Required.** Any assignment or subletting without Landlord's consent shall be void, and shall constitute a default under this Lease which, at the option of Landlord shall result in the termination of this Lease or the exercise of Landlord's other remedies under this Lease.

19.5    **Landlord's Right in Event of Assignment.** If this Lease is assigned or if all or any portion of the Premises are sublet or occupied by any person other than Tenant, Landlord may collect rent and other charges from such assignee or other party, and apply the amount collected to the rent and other charges reserved under this Lease.

## ARTICLE 20

### INDEMNITY

20.1    **Indemnity.** Tenant shall indemnify Landlord and save it harmless from and against any and all suits, actions, damages, claims, liabilities, and expenses in connection with loss of life, bodily or personal injury, or property damage arising from or out of any occurrence in, on, at or from the Premises or the occupancy or use by Tenant of the Premises, or occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, invitees, licensees, or concessionaires, except if such loss of life, bodily or personal injury or property damage is caused by Landlord's gross negligence. If Landlord shall without fault on its part be made a party to any litigation commenced by or against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses, and reasonable attorneys' fees.

20.2    **Landlord Not Responsible.** Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures, or other personal property or to Tenant's business, including any loss or damage to either the persons or property of Tenant, that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting, or adjoining space. Tenant shall store and insure its property in and shall use and occupy the Premises and all other portions of the Business Center at its own risk, and release Landlord, to the full extent permitted by law, from all claims of every kind resulting in loss of life, personal injury, or property damage. Tenant shall give prompt notice to Landlord in case of fire, accidents or defects in the Premises or the Building, or in any fixtures or equipment in the Premises or the Building.

## ARTICLE 21

### INSURANCE

21.1    **Hazard Insurance on Real Estate.** Landlord, at the expense of Tenant as provided in Section 7.4, shall keep the buildings in and improvements to the Building insured in an amount equivalent to not less than 100% of the replacement value exclusive of the cost of excavations and footings below floor level and foundations, against: (a) loss or damage by fire; (b) all risks customarily covered under extended coverage endorsements;

(c) vandalism and malicious mischief; and (d) Maintenance of Premises (but only if) such coverage is reasonably available and is deemed appropriate by Landlord or is required by Landlord's mortgagee. Landlord (and, at Landlord's option, the lender interested under any mortgage or similar instrument then affecting the Premises) shall be solely responsible for determining the amount of fire and extended coverage insurance and the specific endorsements to be maintained. Landlord may also maintain boiler insurance on all heating boilers within the building in such amounts as it determines. Landlord shall be named as an insured on each such policy and at Landlord's option the mortgagee interested under any mortgage affecting the premises shall be named as a loss payee. Subject to the consent of such mortgagee, the proceeds of such insurance in case of loss or damage shall be paid to Landlord to be applied on account of the obligation of Landlord to repair and/or rebuild the Premises pursuant to Article 23. Any proceeds not required for such purposes shall be the sole property of Landlord. On a loss under any of the insurance described in Section 22.5, the deductible amount, if any, which is applicable to such coverage shall be treated as an expense under the provisions of Section 7.4.

21.2    **Insurance on Fixtures and Contents Within the Premises.** At all times during the Term, Tenant shall keep in force at its sole cost and expense, fire and "all-risk" type insurance, including insurance against sprinkler leakage or malfunction and water damage and against vandalism, malicious mischief and theft, covering Tenant's furniture, trade fixtures, furnishings, equipment, inventory and contents on the Premises in the full replacement value. Tenant shall also obtain plate glass insurance covering all plate and window glass in the Premises.

21.3    **Liability Insurance.** Tenant agrees to secure and keep in force from and after the date Landlord first allows Tenant on the Premises to perform Tenant's construction work and throughout the Term, at Tenant's own cost and expense, commercial general liability insurance, covering Tenant against death, bodily and personal injury and property damage in the combined single limit amount of at least One Million Dollars ($1,000,000), or such other amount as Landlord may reasonably determine is necessary. The policy shall name Landlord and any other person designated by Landlord as an additional insured. A copy of the policy or a certificate of insurance shall be delivered to Landlord within 10 days after the Commencement Date. All public liability, property damage, and other liability policies shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry. All such policies shall contain a provision that Landlord, although named as an additional insured, shall nevertheless be entitled to recover under such policies for any loss occasioned to Landlord or its agents and employees by reason of the negligence of Tenant. All such insurance shall specifically insure the performance by Tenant of the indemnity agreement as to liability for injury to or death of persons or injury or damage to property contained in Article 21. Such insurance coverage shall include products liability and completed operations coverage and include a contractual liability endorsement covering the indemnity against injury to persons and damage to property including a personal injury endorsement covering such wrongful acts as a false arrest, false imprisonment, malicious prosecution and libel and slander. Tenant shall also secure and keep in force worker's compensation or similar insurance to the extent required by law. If Tenant sells or dispenses alcoholic beverages as a part of its permitted business operations, Tenant shall also keep in force liquor liability insurance in the combined single limit amount of at least One Million Dollars ($1,000,000).

21.4    **Failure to Obtain Insurance.** Tenant agrees that if Tenant fails to take out or to keep in force any insurance referred to in Sections 22.2 or 22.3, or should any such insurance not be approved by either Landlord or Landlord's lender and should Tenant not rectify the situation within forty-eight (48) hours after written notice by Landlord to Tenant (stating, if Landlord or Landlord's lender does not approve of such insurance, the reasons for such disapproval), Landlord has the right without assuming any obligation in connection with such insurance to effect such insurance at the sole cost of Tenant and all expenditures by Landlord, plus 20%, shall be immediately paid by Tenant to Landlord as Additional Rent on the first day of the next month following such payment by Landlord without prejudice to any other rights and remedies of Landlord under this Lease. Tenant's failure to maintain and provide evidence of such required insurance to Landlord shall also consist of a default of this Lease in accordance with Section 25.1.

21.5    **Insurance Covering Common Areas.** Landlord shall obtain and maintain in force during the Term the following insurance: (a) insurance providing coverage on the insurable improvements to the Common Areas in an amount equal to at least one hundred percent (100%) of the replacement value (as determined by Landlord) and insuring against the perils of fire and extended coverage risks and such other risks, if any, as Landlord may in its sole discretion determine to be appropriate.

21.6    **Subrogation.** Notwithstanding any other provision contained in this Lease, each of the parties waives any rights it may have against the other party on account of any loss or damage to its property and improvements (including the Premises and its contents and property on other portions of the building) which arises from any risk generally covered by the insurance required to be carried under this Lease, whether or not such other party may have been negligent or at fault in causing such loss or damage. Each of the parties shall obtain a clause or endorsement to the policies of such insurance which each party obtains in connection with the Premises or the Building to the effect that the insurer waives, or shall otherwise be denied, the right of subrogation against the other party for loss covered by such insurance.

21.7    **Lenders.** Any mortgage lender interested in any part of the Building shall at Landlord's option, be afforded coverage under any policy required to be secured by Landlord or Tenant under this Lease by use of a mortgagee's endorsement to the policy concerned.

21.8    **Increase in Insurance Premiums.** Tenant shall not stock, use or sell any article or do anything in or about the Premises which may be prohibited by Landlord's insurance policies or any endorsements or forms attached to such insurance, or which will increase any insurance rates and premiums on the Premises, the Building, or any other buildings in the Building.

21.9    **Forcible Entry. On** an unlawful forcible entry into the Premises where damage is done to the structure or contents, Tenant shall be responsible to make all necessary repairs to the Premises, restoring the Premises to a condition equal to that which existed prior to the occurrence of the damage. Such repairs shall be completed within fifteen (15) days following the occurrence of the damage.

## ARTICLE 22

**DESTRUCTION**

22.1    **Restoration.** If the Premises shall be damaged by fire or other casualty, the parties shall, in accordance with Section 23.4, repair the Premises to a condition which is substantially similar to the condition in existence prior to such casualty.

22.3    **Abatement of Rent.** If Landlord is required, or elects, to repair any damage, it shall commence such repair within one hundred eighty (180) days of the casualty, diligently prosecute such repair to completion and, until such repair is complete, Base Rent shall abate proportionately as to the portion of the Premises rendered tenantable.

## ARTICLE 23

**CONDEMNATION**

23.1    **Condemnation.** As used in this Section, the term "Condemnation Proceeding" means any action or proceeding in which any interest in the Building is taken for any public or quasi-public purpose by any lawful authority through the exercise of the power of eminent domain or right of condemnation or by purchase or otherwise in lieu thereof. If the whole of the Premises is taken through Condemnation Proceedings, this Lease shall automatically terminate as of the date of taking.

## ARTICLE 24

**EVENTS OF DEFAULT; REMEDIES**

-17-

24.1     Default by Tenant. Upon the occurrence of one or more of the following events, Tenant shall be deemed to be in default under the terms of this Lease and Landlord may treat any such occurrence as a breach of this Lease and Landlord shall have the remedies set forth in Section 24.2.

       (a)     Should Tenant at any time be in default with respect to any payment of Minimum Annual Rent, Additional Rent or any other charge payable by Tenant pursuant to this Lease for a period of ten (10) days after written notice from Landlord to Tenant (provided, however, any notice shall be in lieu of, and not in addition to, any notice required under Idaho Law)

       (b)     Tenant's failure to pay rent by the date stipulated shall result in the accrual of late fees of $50 for the first day and $10/day thereafter until the rent is paid in full. Payments made by tenant shall first be applied to any late fees, service fees and all other service charges and lastly to rent.

       (c)     If Tenant fails more than twice within any twelve (12) month period to pay rent on time, rents will increase by $50 and shall continue at the higher rate for the duration of the lease term.

24.2     **Landlord Remedies.** Landlord may treat the occurrence of any one (1) or more of the foregoing events as a breach of this Lease and, in addition to any or all other rights or remedies of Landlord by law provided, Landlord shall have the right, at Landlord's option, without further notice or demand of any kind to Tenant or any other person, to declare the Term ended and to re-enter and take possession of the Premises and remove all persons therefrom.

24.3     **Termination of Lease.** Should Landlord elect to terminate this Lease pursuant to the provisions of Sections above, Landlord may recover from Tenant, as damages, the following: (a) The worth at the time of award of any unpaid rental which had been earned at the time of the termination, plus (b) the worth at the time of award of the amount by which the unpaid rental which would have been earned after termination until the time of award exceeds the amount of rental loss Tenant proves could have been reasonably avoided, plus (c) the worth at the time of award of the amount by which the unpaid rental for the balance of the Term after the time of award exceeds the amount of rental loss that Tenant proves could be reasonably avoided, plus (d) any other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom plus, at Landlord's election, any other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by the laws of the State of Idaho. As used in subparagraphs (a) and (b) above, the "worth at the time of award" is computed by allowing interest at the Interest Rate. As used in subparagraph (c) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank situated nearest to the location of the Project at the time of award plus one percent (1%).

24.4     **Definition of Rental.** For purposes of this Article 24 only, the term "rental" shall be deemed to be Minimum Annual Rent, Additional Rent and all other sums required to be paid by Tenant pursuant to the terms of this Lease.

**ARTICLE 25**

**ACCESS TO PREMISES**

       Landlord shall have the right to place, maintain, and repair all utility equipment of any kind in, on, and under the Premises as may be necessary for the servicing of the Premises and other portions of the Building. Landlord shall also have the right to enter the Premises at all times to inspect or to exhibit the same to prospective purchasers, mortgagees, tenants, and lessees, and to make such repairs, additions, alterations, or improvements as Landlord may deem desirable.

**ARTICLE 26**

**CONTRACT**

       With respect to each of Landlord's obligations under any provision of this Lease concerning construction or reconstruction of the Premises, the Building or other improvements in the Building, the obligation concerned shall be fulfilled either, at Landlord's option: (a) by Landlord's arranging to have construction accomplished by one or more contractors licensed in the state in which the Building is located (any of which contractors may, at Landlord's option, be a corporation or other entity directly or indirectly affiliated with or controlled by Landlord); and/or (b) if at the time Landlord is required to fulfill such obligation, it is the holder of a license authorizing it to act as a contractor within such State, by Landlord's participating in construction or reconstruction of the improvements concerned in the capacity of contractor.

**ARTICLE 27**

**SURRENDER OF PREMISES**

       At the expiration of this Lease, Tenant shall surrender the Premises in the same condition as they were in on delivery of possession under this Lease, reasonable wear and tear accepted, and shall deliver all keys to Landlord. Before surrendering the Premises, Tenant shall remove all of its personal property and trade fixtures and such alterations or additions to the Premises made by Tenant as may be specified for removal by Landlord, and shall repair any damage caused by such property or the removal of such property. If Tenant fails to remove its personal property and fixtures on the expiration of this Lease, the same shall be deemed abandoned and shall become the property of Landlord.

**ARTICLE 28**

**HOLDING OVER**

       Any holding over after the expiration of the Term or any renewal term without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion, shall be construed to be a tenancy from month to month at the rents specified in this Lease (prorated on a monthly basis) and shall otherwise be on the terms specified in this Lease so far as possible.

**ARTICLE 29**

**ATTORNEYS' FEES**

       If at any time during the Term either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease or any default under this Lease, then the unsuccessfU1 party in such action or proceeding agrees to reimburse the successfU1 party, for the reasonable expenses of such action, including reasonable attorneys' fees and disbursements incurred by the successful party.

**ARTICLE 30**

**PAST DUE SUMS/ ONLINE PAYMENTS**

       All rents and/or outstanding balances shall be due no later than midnight (12:00am) on the fifth day of the calendar month. If Tenant fails to pay, when the same is due and payable, any Base Rent, Percentage Rent, Additional Rent, or other sum required to be paid by Tenant under this Lease, such unpaid amounts shall bear interest from the due date to the date of payment at the rate of $50 for the first day late (6th day of the month) and then $10/day thereafter until the total rental amount owing is paid. Landlord shall be allowed to collect $25.00 for every returned check. Notwithstanding

-18-

the foregoing, however. Landlord's right conditioned upon serving Tenant notice or demand by the maximum amount which may properly be charged by Landlord for such purposes under applicable law.

Monies paid by Tenant shall be applied in the following order (1) Non-Sufficient Fund Fees, Late Fees and/or Service Fees (2) Tenant Caused Billing (3) Past Due Utilities (4) Attorney Fees (5) Tenant Caused Property Damage, (6) Past Due Rent, oldest month to newest (7) Eviction and/or Termination Fees. Any monies paid by Tenant shall be paid in the foregoing order no matter what the memo line of the check says.

Tenants have the opportunity to view account details and pay online at BeechTreeManagement.com. This service permits rental payments to be deducted from your checking, savings, or debit card account. Related third party and/or management fees may apply for the online processing of payments. If you choose to pay your rent online through one of these methods, we will apply a five-dollar ($5) credit to your account each month. If you choose to pay via any other means, this credit will be removed. To set up your online account please contact our office at *Office@BeechTreeManagement.com*.

## ARTICLE 31

### ADVERTISING

31.1  **No Solicitation.** Tenant and Tenant's employees and agents shall not solicit business in the parking areas or other Common Areas, nor shall Tenant distribute any handbills or other advertising matter on automobiles parked in the parking area or other Common Areas.

31.2  **Promotional Fund.** Waived.

## ARTICLE 32

### MISCELLANEOUS PROVISIONS

32.1  **Notices.** Any notice, demand, request, or other instrument which may be or is required to be given under this Lease shall be delivered in person or only sent by United States certified mail, return receipt requested, postage prepaid or by overnight courier and shall be addressed (a) if to Landlord, at the place specified for payment of rent and (b) if to Tenant, either at the Premises or at any other current address for Tenant which is known to Landlord. Either party may designate such other address as shall be given by written notice.

32.2  **Partial Invalidity.** If any provision of this Lease or the application of any provision to any person or circumstance shall to any extent be invalid, the remainder of this Lease or the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected and each provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

32.3  **Entire Agreement, Etc.** This Lease and the Exhibits, Rider, and/or Addendum, if any, attached to this Lease, set forth the entire agreement between the parties. Each Exhibit, Rider, and Addendum mentioned in this Lease are incorporated by this reference.

32.4  **Governing Law.** The interpretation of this Lease shall be governed by the laws of the State of Idaho. Tenant expressly and irrevocably agrees that Landlord may bring any action or claim to enforce the provisions of this Lease in the State of Idaho, County of Ada, and Tenant irrevocably consents to personal jurisdiction in the State of Idaho for the purposes of any such action or claim.

32.5  **Recourse by Tenant.** Anything in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and property of Landlord in the land and the buildings comprising the Building, subject to the prior rights of any mortgagee of all or any portion of the Building, for the collection of any judgment or other judicial process requiring the payment of money by Landlord on any default or breach by Landlord with respect to any of the terms, covenants, and conditions of this Lease to be observed and/or performed by Landlord, and no other asset of Landlord shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

32.6  **Authority of Signatories.** Each person executing this Lease individually and personally represents and warrants that he is duly authorized to execute and deliver the same on behalf of the entity for which he is signing (whether it be a corporation, general or limited partnership or otherwise), and that this Lease is binding on such entity in accordance with its terms.

## SIGNATURES

LANDLORD AND TENANT have executed this Lease on the respective dates set forth below, to be effective as of the date first set forth above.

**LANDLORD:**

an Idaho limited liability company by its manager
Beech Tree Property Management, LLC (Property Management)
An Idaho limited liability company

Print:  **Cory Tanner**
Date:   **12/31/2020**

**TENANT:**

an Idaho Allergy LLC, and Idaho company by its Owner, Sanjeev Jain,

Print:  SANJEEV JAIN
Date:   12/31/2020

-19-

## EXHIBIT "A"
### Description of Entire Premises

The premises located at 379 E. Shore Drive, Ste. 100, Eagle, ID 83616. This space includes roughly 3,126 square feet of leasable space which includes a reception and waiting area, private offices, break areas, clinical patient rooms and additional open flex space. The space occupies roughly half of the existing square footage of the building. An additional storage room in suite 120 is also part of this lease agreement which includes approximately 96 sq. ft. The total square footage leased is approximately 3,222.

## EXHIBIT "B"
### Sign Criteria

Tenant's sign on the Leased Premises and the design, construction and location thereof shall be in accordance with procedures established by Landlord for the Business Center, shall be subject to the approval of the Landlord and, unless authorized in writing by Landlord, shall not deviate from the following criteria:

A.      Approval of design, content, material, color, size. details and location of sign must be obtained from Landlord. Tenant shall submit two blue line to scale prints to Landlord for approval prior to fabrication and erection of the sign. The drawings are to show the details of the sign and its location on the fascia of the Business Center. If needed, elevations drawings of the Business Center are available from the Landlord. Although previous sign applications of Tenant may be considered, such signs will not necessarily govern the sign to be installed on the Leased Premises.

B.      The height, type, style, location and size of all letters and raceway shall be subject to the approval of the Landlord. Size shall be appropriate to the location of the sign, the size of the building (Leased Premises).

C.      No labels will be permitted on exposed surface of Tenant's sign except those required by local ordinance.

D.      The sign shall not be placed on the roof of the Leased Premises.

E.      Wording in the sign shall be limited to a brief identification of the store name or business.

F.      Sign supports, wiring, transformers, raceways and crossovers must be concealed.

G.      Any penetration of the building structure required for sign installation shall be neatly sealed in a watertight condition.

H.      No sign will be permitted which flashes, rotates, makes noise or has moving elements or lights.

I.      The Tenant will be held liable and shall bear all costs for removal and/or correction of the sign, sign installation and damage to the building by sign installations.

J.      Tenant's store front sign shall be installed prior to the date Tenant opens for business.

K.      Tenant shall be permitted to install signage upon approval on the East facing (Meridian Road side) side of the building above the Revitalize Wellness sign.

**For sign approval**, submit blue line prints to scale with all the relevant information to: Beech Tree Property Management Attention: Cory Tanner, cory@beechtreemanagement.com, 1577 North Linder Road, #325, Kuna ID 83634.

### EXHIBIT "C"
#### Rules and Regulations

The following are Landlord's current rules and regulations:

1.     All loading and unloading of goods shall be done only at such times, in the areas and through entrances designated for such purposes by Landlord.

2.     The delivery or shipping of merchandise, supplies and fixtures to and from the Premises shall be subject to such rules and regulations as in the judgment of Landlord are necessary for the proper operation of the Premises or Business Center.

3.     No person shall use any utility area, truck facility or other area reserved for use in connection with the conduct of business except for the specific purpose for which permission to use such area is given.

4.     No employee shall use any area for motor vehicle parking, except the area or areas specifically designated for employee parking. No employer shall designate any area for employee parking, except such area or areas as are designated in writing by Landlord. Tenant shall pay a fine to Landlord of $20 for each parking violation of Tenant's employees, agents, or licenses.

5.     No person without the express written consent of Landlord shall:

    a.     Vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet, or other material whatsoever outside the Premises;

    b.     Exhibit any sign, placard, banner, notice or other written material which can be seen from outside the Premises;

    c.     Distribute any circular, booklet, handbill, placard or other material outside the Premises;

    d.     Solicit membership in any organization, group, or association or contribution for any purpose outside the Premises;

    e.     Parade, patrol, picket, demonstrate or engage in any conduct that might tend to interfere with or impede the use of the Common Areas by Landlord or any occupant or any employee or invitee of any occupant, create a disturbance, attract attention or harass, annoy, disparage, or be detrimental to the interest of any business establishments within the Business Center;

    f.     Use the Common Areas for any purpose when none of the business establishments within the Business Center is open for business or employment;

    g.     Throw, discard, or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles or create litter or hazards of any kind; or

    h.     Deface, damage or demolish any sign, light standard or fixture, landscaping material or other improvement within the Business Center

6.     The outside area immediately adjoining the Premises shall be kept clean and free from dirt and rubbish by Tenant to the satisfaction of Landlord, and Tenant shall not place or permit any obstructions or merchandise in such areas.

7.     The plumbing facilities shall not be used for any purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage or damage resulting h m a violation of this provision shall be borne by Tenant.

8.     All floor area, including vestibules, entrances and returns, door fixtures, windows and plate glass shall be maintained in a safe, neat and clean condition.

9.     No portion of the Business Center shall be used for lodging purposes.

# BEECH TREE
## PROPERTY MANAGEMENT

### ADDITIONAL SPACE CONTRACT ADDENDUM

Property Address: 379 East Shore Drive Suite 100, Eagle ID 83616
Tenant: Idaho Allergy LLC

THIS STATEMENT GUARANTEES THAT, pursuant to the lease agreement by which the above-mentioned tenants hold possession of the premises described, tenants have requested and have been approved to add additional square footage to the currently leased space at the above-mentioned location. The added space is described as the following:

New space includes a storage room next to the already leased storage room located in the back of Suite 120. This space consists of 96 sq ft of storage space. The room will be given a locking door and the tenant shall be furnished a key for access. Once suite 120 has been leased to another tenant, access to the space must be granted by that tenant during normal business hours.

**RENT EXPENSE.** Rent for this space shall be consistent with the square footage rent for the rest of the building at $24/sq ft. Total monthly rent shall be $192 per month.

**TERM.** Term for this space shall be considered month-to-month. Tenant shall have the ability to rent monthly but shall be required to give at least a 30-day notice to move out prior to vacating. For the purposes of this lease, a "month" may only be given as a regular calendar month. No prorations of rent shall be acceptable.

**LEASE TERMS.** All other lease terms and provisions which are related to and agreed upon in the original lease signed on 12/31/20 by Dr. Sanjeev Jain shall extend to this additional space with exception to the lease term and the increase in rent. This space shall remain as a monthly lease until it is terminated.

-------------------------------------------------------------------------------------------------------------------------------------------

SIGNATURES
The below signature by the Property Manager acknowledges and approved the requested additional space for lease as requested by Heather Hege and other staff at Idaho Allergy, LLC and in accordance with our agreed upon arrangement.

_____    **1/1/2021**
Signature of Property Manager              Date

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
500 Capitol Mall, Suite 2250
Sacramento, CA  95814

A true and correct copy of the foregoing document entitled (*specify*): HARBIN TERRACE, LLC'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM AND TO COMPEL PAYMENT OF ADMINISTRATIVE RENT AND TO COMPEL ASSUMPTION OR REJECTION OF LEASE; DECLARATION OF CRAIG HARBIN IN SUPPORT THEREOF
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
____7/28/2023____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Michael Jay Berger**    michael.berger@bankruptcypower.com,
  yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Arnold L Graff**    agraff@wrightlegal.net, bkudgeneralupdates@wrightlegal.net;jpowell@wrightlegal.net
- **Gregory Kent Jones (TR)**    gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com
- **Steven K Linkon**    slinkon@wrightlegal.net, jpowell@wrightlegal.net,bkudgeneralupdates@wrightlegal.net
- **Kelly L Morrison**    kelly.l.morrison@usdoj.gov
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) ____7/28/2023____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
Honorable Vencent P. Zurzolo
United States Bankruptcy Court
255 E. Temple Street, Suite 1360/ Courtroom 1368
Los Angeles, CA 90012

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/28/2023 | Allison S. Kieser | /s/ Allison S. Kieser |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

F 9013-3.1.PROOF.SERVICE

2.  SERVED BY UNITED STATES MAIL:

Jason J. Blakley
Givens Pursley
601 West Bannock St
Post Office Box 2720
Boise, ID 83701

David Crapo
One Gateway Center
Newark, NJ 07102-5310

Idaho Allergy, LLC
43575 Mission Blvd., #716
Fremont, CA 94539

Office of the US Trustee
Kelly L. Morrison, Esq.
915 Wilshire Blvd., Ste. 1850
Los Angeles, CA 90017

SubChapter V Trustee
Gregory Kent Jones (TR)
Stradling Yocca Carlson & Rauth
10100 N. Santa Monica Blvd., Suite 1400
Los Angeles, CA 90067

Beech Tree Property Management
1577 N. Linder Rd. #325
Kuna, ID 83634

Brownstone Funding
12 Bayview Ave., Ste. 592
Lawrence, NY 11559

Franchise Tax
Bankruptcy Section MS: A-340
PO Box 2952
Sacramento, CA 95812-2952

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO CA 95812-2952

Harbin Terrace, LLC
c/o Jason Blakley
Givens Pursley LLP
601 W. Bannock St.

Boise, ID 83701

IRS
P.O. Box 7346
Philadelphia, PA 19101

Itria
c/o DLA Piper LLP
Attn: C. Kevin Kobbe, Esq.
6225 Smith Avenue
Baltimore, MD 21209

Itria
One Penn Plaza, Ste. 3101
6225 Smith Ave.
New York, NY 10119

JP Morgan Chase Bank, N.A.
c/o Wright Finlay & Zak
Steven K. Linkon, Esq.
612 S. Lucile Street, Ste 300
Seattle, WA 98108

Kapitus LLC
2500 Wilson Blvd., STe. 350
Arlington, VA 22201

Sanjeev Jain
43575 Mission Blvd., #716
Fremont, CA 94539

U.S. Dept. of Justice
Ben Franklin
PO Box 683
Washington, DC 20044

U.S. Small Business Admin
c/o Elan S. Levey
300 N. Los Angeles
Fed. Bldg. Rm 7516
Los Angeles, CA 90012

U.S. Small Business Administration
312 N. Spring St., 5th Fl
Los Angeles, CA 90012

UnitedHealthcare Insurance Company
ATTN: CDM/Bankruptcy
185 Asylum Street - 03B
Hartford, CT 06103

WRIGHT, FINLAY & ZAK, LLP
Arnold L. Graff, Esq.
4665 MacArthur Court, Suite 200
Newport Beach, CA 92660

Michael Jay Berger
The Law Offices of Michael Jay Berger
9454 Wilshire Blvd., 6th Fl.
Beverly Hills, CA 90212-2980